CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
January 21, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| Jared Ethan West, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:24-cv-00027 |
| | ) | |
| City of Charlottesville *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This matter is before the court on Defendants City of Charlottesville, Steve Hawkes, Flora Kelly-Bertsche, and Maria Weiss's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 10.) For the reasons stated below, the court will grant Defendants' motion to dismiss as to the individual Defendants, the claim of discrimination brought against the City of Charlottesville, and the claim of retaliation brought against the City of Charlottesville to the extent it seeks monetary relief. The court will deny Defendants' motion as to the claim of retaliation brought against the City of Charlottesville to the extent it seeks injunctive relief.

# I.    Background

## A. Factual History

Plaintiff Jared Ethan West ("West"), proceeding *pro se*, brought this employment action against Defendant City of Charlottesville ("City") and Defendants Steve Hawkes ("Hawkes"), Maria Weiss ("Weiss"), and Flora Kelly-Bertsche ("Kelly-Bertsche"), all City employees. West claims Defendants violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, when the City terminated his employment as a Technical Support Specialist following the disclosure of his epilepsy to Hawkes, Weiss, and Kelly-Bertsche. The facts are taken from West's complaint and, at this stage, are presumed to be true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

West has suffered from epilepsy since 2018. (Am. Compl. at 17, ¶ 3 (Dkt. 7).) His diagnosis has impacted major life activities, including issues with "sleeping, waking, anxiety and depression." (*Id.* ¶ 5.) On November 10, 2021, West began work as a Technical Support Specialist in the City of Charlottesville's Information Technology Department. (*Id.* ¶¶ 6–7.) West's qualifications for the role included U.S. Army training in information technology and approximately one year of experience working as a Desktop Support Analyst. (*Id.* ¶ 8.) At all relevant times, West was a probationary employee of the City. (Am. Compl. Ex. 2 at 2 (Dkt. 7-2) [hereinafter "Ex. 2"]; Pl.'s Resp. to Mot. to Dismiss at 1 (Dkt. 14) [hereinafter "Pl.'s Resp."].) As a Technical Support Specialist, West staffed the City's Helpdesk, which fielded IT-related questions and requests from City employees. (Ex. 2 at 27.) West's Helpdesk responsibilities included responding to service requests by phone or email, resolving IT issues

- 2 -

or routing them to the appropriate engineer, performing maintenance or repairs on personal computers, maintaining accurate records of all service calls, and "[p]erform[ing] other duties as assigned." (*Id.*) The role as advertised required "[b]asic project management skills and [the] ability to accurately interpret requirements, analyze data, reason logically, exercise sound judgment, and develop effective solutions to problems." (*Id.*) The Technical Support Specialist needed to "[r]elate well with people and have excellent communications [sic] skills to provide assistance in a competent and friendly manner." (*Id.*)

Because of significant staff turnover, "[t]raining was disjointed and inconsistent." (*Id.* at 4.) Hawkes, stepping into the role of interim IT Director shortly after West was hired, implemented new "policy changes" in the department. (*Id.*) Though West received "brief" initial training from two experienced Helpdesk employees, both left their roles after two weeks. (*Id.*) Their departures left West and one other new employee, Tyler Ringling ("Ringling"), to run the Helpdesk. (*Id.*) West's immediate supervisor, Tyler Henderson ("Henderson"), joined the department in early or mid-December and implemented another new policy of email check-ins each morning. (*Id.* at 3–4.) And IT Operations Manager Maria Weiss, who supervised the Helpdesk, joined the department in mid-January. (*Id.* at 4.) West found that "multiple changes in personnel during this time caused confusion about supervision as well as training and procedural inconsistencies." (*Id.*)

During his first month and a half of employment, West claims he "successfully performed the duties of his job." (Am. Compl. at 17, ¶ 9.) Nevertheless, he concedes he was not always a model employee. After email check-ins began in late December, West admits

- 3 -

that "there were days when [he] forgot to login first thing" (Ex. 2 at 3) or sent late "online" notifications (*id.* at 5), and that on at least one occasion he was late to enter his time (*id.*). West reiterates, however, that other employees behaved similarly. For instance, "other employees similarly situated were also emailing in late," (*id.* at 3), "[o]ther employees also would send late 'online' notifications," (*id.* at 5), and "[o]ther people, including Tyler Ringling, were also late putting in their time" (*id.*). Despite these infractions, West reports having "received no discipline prior to his seizure on January 13, 2022." (*Id.* at 16.)

On December 28, 2021, West disclosed to interim IT Director Hawkes that he had been diagnosed with epilepsy and that he was struggling due to changes in his medication. (*Id.* at 5; Am. Compl. at 17, ¶ 10.) He also revealed that he had experienced a focal seizure during a meeting. (Ex. 2 at 5.) When West experienced another seizure at work on January 13, 2022, his supervisor Henderson sent him home to work remotely "until his condition resolved." (*Id.* at 6.) Hawkes informed the City's Human Resources department the next day of West's condition. (*Id.*)

West continued to work remotely through the month of January. (*Id.* at 10.) It is unclear whether he did so because he was directed to "work remotely until [his] medical issue resolved" (Am. Compl. at 22, ¶ 1) or because "family members in [his] home tested positive for COVID, [so he] was permitted to work from home until February 8, 2022" (*id.* at 9). Regardless, West found that "[w]orking from home was difficult as the tools used to work from home were not sufficient to timely answer calls and it was causing stress," which in turn aggravated his epilepsy. (*Id.* at 22, ¶ 1.) Specifically, the system used to remotely answer phone

- 4 -

calls for the Helpdesk suffered from a delay, resulting in West being unable to respond to the ringing phone before his co-workers in the office. (Ex. 2 at 8–9.) West also experienced issues connecting to the VPN for remote work. (*Id.* at 7.)

Further, weeks spent away from the office left West "isolated" from his co-workers and unsure of office practices. (Am. Compl. at 22, ¶ 1.) On one occasion, the other Technical Support Specialist received training that West did not. (Ex. 2 at 9.) On at least two occasions, West was reprimanded for behavior he had seen modeled by Henderson or Hawkes. (*Id.* at 7, 9.) Hawkes additionally reprimanded West for failing to send his morning check-in email on January 19. (*Id.* at 6.) During this time, winter storms and a doctor's appointment impacted West's tardiness, while continuing VPN issues impacted his work performance. (*Id.* at 7.)

Following West's disclosure of his epilepsy, Hawkes encouraged West to apply for leave under the Family and Medical Leave Act ("FMLA"), though West was not eligible as he had only been employed with the City for a short period of time. (*Id.* at 6–7.) On January 25, West also received an email from Kelly-Bertsche, the Organizational Development/Learning Coordinator in the City's Human Resources Department. (*Id.* at 42.) The email's subject line was one word, "Meet," and the body of the email comprised of just two sentences: "I'm following up on the message to you from Steve Hawkes indicating that I would be contacting you regarding your concerns. Please let me know your availability to meet virtually this week." (*Id.*) Unsure to what she was referring, West did not respond to Kelly-Bertsche's email. (*Id.* at 7.) He did, however, speak with Kelly-Bertsche on the phone the following day "clarifying what was needed and verifying that he did not qualify for FMLA." (*Id.*) Kelly-

Bertsche sent a follow-up email on January 31, to which West also did not reply. (*Id.* at 72–73.)

On February 3, 2022, after three weeks of working from home, West requested an accommodation while on a Teams meeting from Hawkes and Weiss in the form of a schedule change, as West's seizures "caused issues with sleep and waking." (Am. Compl. at 22, ¶ 2; Ex. 2 at 16.) Specifically, West asked that he begin work at 9:00 a.m. and end work at 5:00 p.m. (Am. Compl. at 9.) West additionally informed Weiss of his epilepsy, to which she replied indicating that Hawkes had informed her. (Ex. 2 at 100.)

The following day, Hawkes and Weiss met with West over Teams to reprimand him for his work performance. (Am. Compl. at 18, ¶ 18.) West subsequently emailed Hawkes "stating that he was having issues with his epilepsy medication and mental health" (*id.* ¶ 19) and "stat[ing] [his] rights again" under the ADA (*id.* at 22, ¶ 2. (*See* Ex. 2 at 69.) In response, West was directed to provide a physician's note supporting his requested accommodation to Human Resources. (Am. Compl. at 22, ¶ 3.) West promptly emailed a U.S. Army medical exam form containing medical documentation from his neurologist to Kelly-Bertsche. (Ex. 2 at 56–63.) Kelly-Bertsche responded one hour later confirming receipt but informing West that he would be placed on administrative leave with pay until he could provide documentation from a physician that "address[ed] [his] ability to perform the duties of [his] current job" and "include[d] a release for [West] to return to work." (*Id.* at 54.) Kelly-Bertsche also requested documentation of any driving restrictions placed on West due to his disability. (*Id.*)

- 6 -

West remained on administrative leave with pay until February 28, 2022. (Am. Compl. at 23, ¶ 7.) West "was not clear exactly what [the City and Kelly-Bertsche] were requesting" with his medical documentation until Kelly-Bertsche's February 4 email asking about West's ability to drive. (Ex. 2 at 9–10.) West emailed a second U.S. Army medical exam form to Kelly-Bertsche on February 11, 2022. (*Id.* at 82–89.) Kelly-Bertsche reiterated that the letter must state West was "released" to return to work and that West would continue being placed on administrative leave with pay until the City's receipt of such a letter. (Am. Compl. at 22–23, ¶ 5.) West submitted a third letter from his physician specifically releasing West to work on Sunday, February 20, 2022. (*Id.* at 23, ¶ 6.) Kelly-Bertsche confirmed receipt of that letter on Wednesday, February 23, and West was allowed to return to work the following Monday. (*Id.*)

West returned to work on February 28 with three accommodations: (1) a regular schedule of 9:00 a.m. to 5:00 p.m., which required West to take lunch at his desk; (2) a six-month reprieve from working "on-call" to answer Helpdesk questions after hours; and (3) a six-month period in which West would not be required to drive a vehicle to fulfill his work duties. (*Id.* at 9; Ex. 2 at 16.) West claims that the day he returned to work, Hawkes provided "no re-orientation, training, updates to procedures or policies, or other updates [West] may have missed since he had been excluded from staff meetings during his absence from the office." (Ex. 2 at 10–11.) Hawkes did, however, provide West an email "recap of the discussion" the pair had that morning. (*Id.* at 90.) The email outlined five clear performance expectations: (1) that West "respond and assist customers in a timely manner" and

communicate with Weiss and Hawkes regarding any Helpdesk tickets they assigned to him;
(2) that he start work at 9:00 a.m. and finish at 5:00 p.m., with approval required for any
deviations from that schedule; (3) that he enter all requests received into the Helpdesk system;
(4) that he provide clear descriptions of problems and solutions in Helpdesk tickets; and (5)
that he "continue to be a contributing member of the Helpdesk team and answer help desk
phone calls." (*Id.*) The email did not specifically reference West's epilepsy or address "his
needs should he have another seizure while at work." (*Id.* at 11.)

During West's first week back, he worked only three days due to a city holiday and an
Army appointment. (*Id.*) West acknowledges that he closed relatively few Helpdesk tickets
that week but maintains that this was attributable to the short week, his co-workers' earlier
start times being better suited to resolve the "[m]any tickets [that] come in earlier in the day
when most employees begin work and have issues starting up hardware or software to begin
their workday," questions asked to his co-workers while working tickets, and the differing
complexity of tickets. (*Id.* at 11–12.)

Regardless, Hawkes and Weiss met with West to deliver a formal reprimand on Friday,
March 4. (*Id.* at 12–13.) In a memorandum emailed to West at that time, Hawkes reiterated
the expectations outlined in his earlier email and named multiple performance issues that had
apparently been discussed on West's return to work. (*Id.* at 99.) Hawkes informed West that
his performance issues had continued that week: West arrived late to work on Friday without
prior approval, West closed "significantly less" Helpdesk tickets than other staff, and West
sent multiple questions to other staff while closing those tickets. (*Id.*) Hawkes also mentioned

- 8 -

that in early February, West had left work early without approval to work a non-City job.  (*Id.*)

At the conclusion of the email, Hawkes noted that "further performance or conduct issues

may result in disciplinary actions up to and including termination of [West's] employment."

(*Id.*)  Hawkes put West on a performance improvement plan and told West that he had two

weeks to improve.  (*Id.*; Am. Compl. at 23, ¶ 8.)  West, for his part, told Hawkes and Weiss

that he felt he "was being targeted and that items in the reprimand were fabricated."  (Am.

Compl. at 23, ¶ 8.)  West reports that Weiss later admitted in the City's grievance process that

at least one of the listed offenses in the reprimand was untrue, and that one of West's co-

workers "had similar infractions."  (*Id.* at 20, ¶ 34.)

 Two days after the reprimand, West sent Hawkes and Weiss an email with the subject

line "Reminder."  (Ex. 2 at 97.)  The body of the email read as follows:  "I know I was out for

3 weeks and with my memory issues it's been hard remembering some things I learned and

worked on but doesn't mean I won't push myself to learn again and work myself during these

times, thank you both."  (*Id.*)  West received no reply.  (Am. Compl. at 24, ¶ 9.)

 West continued to work for the next two weeks.  (Ex. 2 at 17.)  During this time, West

was absent from work for "multiple doctors' appointments related to his disability."  (*Id.*)  With

Ringling out on leave, West and Henderson were the only remaining technicians manning the

Helpdesk.  (*Id.*)  On March 17, West arrived at work midday following a deposition for an

unrelated case.  (*Id.* at 14.)  Beginning at 12:30 p.m., West was left alone to man the Helpdesk,

as Hawkes was absent and Weiss and Henderson had early departures.  (*Id.* at 14–15.)

West arrived late to work the next day due to a doctor's appointment related to his medication management.  (Am. Compl. at 20, ¶ 37; Ex. 2 at 15; *see id.* at 111.)  Shortly after his arrival, the City terminated West's employment and escorted him off the premises, citing his failure to comply with the requirements outlined in the March 4 formal reprimand.  (Am. Compl. at 10; *id.* at 20, ¶ 37.)  West reports that multiple points in the accompanying reprimand were "misstated or incorrect."  (*Id.* at 20, ¶ 37.)  He also alleges that "[s]everal of the stated reasons for [his] termination were also performed by [his] peers, supervisors, and IT director himself, further indicating different treatment and discrimination and retaliation because of [West's] disability."  (*Id.* at 24, ¶ 10.)

West claims that, following termination, he "suffered from increased anxiety and depression" and began taking medication to treat those conditions.  (*Id.* at 21, ¶ 42.)  He also claims that his termination resulted in his being unable to purchase a home, because he could not provide proof of income, and that he was rejected from a firefighting job with Albemarle County because of his termination.  (*Id.* ¶¶ 43–44.)

West's complaint seeks monetary relief in the form of $20,000 in compensatory damages for lost wages and benefits and $25,000 for emotional distress related to lost job opportunities and the inability to complete the purchase of a home, among other losses.  (*Id.* at 6.)  He also requests that he be placed on the City's list of eligible employees, that the City provide no negative references as to his previous employment, that his medical records be separated from his personnel file, that all disciplinary records be purged, and that the City receive formal training on epilepsy and its effects.  (*Id.*)

- 10 -

## B. Procedural History

West filed a grievance with the City on March 29, 2022.  (*Id.* at 20, ¶ 38.)  He filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on August 4, 2022.  (*Id.* at 9–10.)  The charge alleged discrimination based on disability and retaliation dating from January 28, 2022, to March 18, 2022.  (*Id.* at 9.)  The EEOC issued a Determination and Notice of Right to Sue on January 26, 2024.  (*Id.* at 12–16.)

Exactly ninety days later, West, proceeding *pro se*, filed his first complaint against the City, Hawkes, Kelly-Bertsche, and Weiss.  (Dkt. 1.)  He also filed a motion for leave to proceed *in forma pauperis*.  (Dkt. 2.)  The following day, District Judge Robert S. Ballou entered an oral order informing West that his complaint was deficient because it was missing a signature as required by Federal Rule of Civil Procedure 11(a).  (Dkt. 3.)  The order instructed West to submit a signed complaint within ten days.  (*Id.*)  Magistrate Judge Joel C. Hoppe also granted West's *in forma pauperis* request.  (Dkt. 6.)  On April 29, 2024, four days after his initial filing, West filed an amended complaint complying with the court's oral order.  (Am. Compl.)  Though West filed his amended complaint outside the EEOC's 90-day window for filing, "[e]quitable tolling has been permitted 'where the claimant has actively pursued his judicial remedies by filing a defective pleading during' the limitations period."  *Gayle v. United Parcel Serv., Inc.*, 401 F.3d 222, 226 (4th Cir. 2005) (quoting *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990)).  The court accordingly considers West's complaint as timely filed.

- 11 -

In response, all Defendants filed a motion to dismiss on May 23, 2024. (Dkt. 10.) The next day, the court sent West a *Roseboro* notice informing him that he had twenty-one days to file a response, or he would risk dismissal of the case for failure to prosecute. (Dkt. 12.) West responded on June 17 (Pl.'s Resp.) and Defendants replied on June 24 (Defs.' Reply Br. in Supp. of Mot. to Dismiss (Dkt. 15) [hereinafter "Defs.' Reply]). The motion is fully briefed and ripe for review.

## II.    Standard of Review

West "is not obligated to make out a prima facie case of discrimination at the pleading stage of litigation." *Whorley v. Int'l Paper*, 620 F. Supp. 3d 434, 437 & n.2 (W.D. Va. 2022). Instead, on a motion to dismiss a claim of discrimination or retaliation, "the ordinary rules" of pleading apply. *Barbour v. Garland*, 105 F.4th 579, 590 (4th Cir. 2024)[1] (requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief" (quoting Fed R. Civ. P. 8(a)(2))); *see Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002) (same). West therefore "must allege facts sufficient to render all elements of his claim plausible under the familiar strictures of Rule 12(b)(6) review." *Whorley*, 620 F. Supp. 3d at 437 (citing *McCleary-Evans v. Md. Dep't Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015)).

---

[1] "Because the ADA echoes and expressly refers to Title VII, and because the two statutes have the same purpose—the prohibition of illegal discrimination in employment—courts have routinely used Title VII precedent in ADA cases." *Kelly v. Town of Abingdon, Va.*, 90 F.4th 158, 169 n.6 (4th Cir. 2024) (quoting *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001)); *accord Israelitt v. Enter. Servs. LLC*, 78 F.4th 647, 655 n.8 (4th Cir. 2023). "Accordingly, our precedent for evaluating discrimination and retaliation claims under Title VII informs our analysis of the same theories of relief under the ADA." *Kelly*, 90 F.4th at 169 n.6.

- 12 -

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). They do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In reviewing a motion to dismiss for failure to state a claim, "a court must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Bing*, 959 F.3d at 616. Evaluation is generally limited to the complaint itself. Fed. R. Civ. P. 12(d). When determining what constitutes a complaint, *pro se* plaintiffs are "entitled to 'a liberal construction of the documents [they] deposited with the clerk.'" *Pendleton v. Jividen*, 96 F.4th 652, 656 (4th Cir. 2024) (quoting *Allen v. Atlas Box & Crating Co.*, 59 F.4th 145, 149 (4th Cir. 2023)). "Indeed, courts routinely look beyond what pro se litigants identify as their 'complaint' and analyze the substance of any included documents in considering a motion to dismiss for failure to state a claim." *Id.*

A court may also examine documents attached to the complaint as exhibits or those explicitly incorporated into the complaint by reference. Fed. R. Civ. P. 10(c); *see Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). Pursuant to the exhibit-prevails rule,

- 13 -

"[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167.  But when a plaintiff offers a document for any reason other than its truthfulness, "it is inappropriate to treat the contents of that document as true." *Id.* (providing examples).  The plaintiff's purpose is especially important when the document is prepared by or for the defendant, as "[s]uch unilateral documents may reflect the defendant's version of contested events or contain self-serving, exculpatory statements that are unlikely to have been adopted by the plaintiff." *Id.* at 168.

## III.    Analysis

### A. Filings Under Consideration

The parties devote significant portions of their briefs to discussion of the documents available for the court to consider in ruling on this motion.  The court first addresses the admissibility of West's response to the motion and then turns to West's complaint and attached documents.  For the reasons outlined below, the court will consider West's response and certain portions of West's complaint and attached exhibits for the purposes of resolving this motion.  The court will not, however, consider the City of Charlottesville's EEOC position statement for any purpose beyond establishing the exhaustion of West's ADA claims.

#### 1.  West's Response to Defendants' Motion to Dismiss

To begin, Defendants observe that West's response to the motion at issue was not timely filed.  (Defs.' Reply at 1–2.)  As they note, West's response was due by Friday, June 14,

- 14 -

2024. (*See* Dkt. 12 at 1.) West filed on Monday, June 17—three days after the deadline. (Pl.'s Resp.) Defendants accordingly request that West's response "be stricken and not considered." (Defs.' Reply at 2.)

Though *pro se* litigants are generally afforded more leeway than counseled parties, they remain "subject to the time requirements and respect for court orders without which effective judicial administration would be impossible." *Ballard v. Carlson*, 882 F.2d 93, 96 (4th Cir. 1989). Federal Rule of Civil Procedure 6(b) provides that a court may extend the deadline for filing a pleading with or without a motion if the court acts or a request is made before the original deadline expires. A court may also extend such a deadline after its expiration on motion made by a party who establishes "excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). Here, the court did not provide such an extension prior to the June 14, 2024 deadline. Nor has West moved for an extension based on excusable neglect. The court therefore finds West's response to Defendants' motion to dismiss is untimely.

Despite this finding, the court will consider West's response in ruling on Defendants' motion to dismiss.[2] Animating this decision is the fact that West's three-day delay fell over a weekend, minimizing prejudice to Defendants. That West's delay does not appear intentional

---

[2] Pursuant to their discretion, courts in this circuit have at times afforded *pro se* plaintiffs short grace periods in which untimely responses may still be considered. *See, e.g.*, *Asbury v. City of Roanoke*, 599 F. Supp. 2d 712, 717 n.3 (W.D. Va. 2009) (considering response filed two days late); *Allison v. Soc. Sec. Admin.*, No. 4:09cv89, 2010 WL 1224874, at *1 n.3 (E.D. Va. Feb. 23, 2010) (considering response filed four days late); *Jackson v. Bennett*, No. 7:17-cv-00166, 2018 WL 2123624, at *1 n.1 (W.D. Va. May 8, 2018) (refusing to consider response filed twenty-three days late); *but see Bean v. Trident Marketing*, No. 1:18CV581, 2019 WL 1979960, at *1–2 & n.1 (M.D.N.C. May 3, 2019) (considering response filed six months late).

or in disrespect of the court is also significant.  *See Houey v. Carolina First Bank*, 890 F. Supp. 2d 611, 618 (W.D.N.C. 2012) (refusing to consider a response to a motion to dismiss filed seven days late where "[t]here have been improper filings, and late filings, and a general disregard for the Court's orders and ordinary procedures").

Finally, the court notes that consideration of West's response makes no meaningful difference in the disposition of this motion.  Most of the pleading appears copied straight from *Goines* and West's state-law emotional distress claims do not appear in his amended complaint and are therefore not appropriate for consideration by the court.  *See, e.g., Materson v. Stokes*, 166 F.R.D. 368, 372 (E.D. Va. 1996) (finding *pro se* plaintiff could not defeat a motion to dismiss by raising new allegations in his response and directing plaintiff to request leave to amend his complaint under Federal Rule of Civil Procedure 15(a) if he wished to raise those allegations).  Even if this court declined to consider West's response as untimely and viewed Defendants' motion to dismiss as unopposed, it "nevertheless has an obligation to review the motion[] to ensure that dismissal is proper."  *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 416 n.3 (4th Cir. 2014) (citing *Pomerleau v. W. Springfield Pub. Schs.*, 362 F.3d 143, 145 (1st Cir. 2004)).  Though the court will consider West's response in this instance, it cautions the parties that all filings must be timely in the future.

2.  <u>West's Complaint and Attached Documents</u>

West's amended complaint includes a form *pro se* Complaint for Employment Discrimination, the charge West filed with the EEOC, the EEOC's Notice of Right to Sue letter, a "Statement of Facts," and a "Statement of Claims."  Under a "liberal construction,"

- 16 -

these documents collectively form West's pleading and may be considered by the court when deciding this motion. *See Pendleton*, 96 F.4th at 656.

West also attaches three exhibits to his amended complaint: the City's position statement filed with the EEOC (Am. Compl. Ex. 1 (Dkt. 7-1)), West's submission in rebuttal (Ex. 2), and West's relevant medical records (Am. Compl. Ex. 3 (Dkt. 7-3)). Under Federal Rule of Civil Procedure 10(c), the court may consider documents attached to the complaint as exhibits at its discretion without converting the motion to one for summary judgment. *See Goines*, 822 F.3d at 166. Because West has plainly adopted the contents of his own rebuttal submission to the EEOC and his medical records, and because he offers them for their truthfulness, the court will consider those two exhibits in ruling on the present motion to dismiss.

The court will also consider any portion of the City's position statement which West cites as an exhibit or directly quotes and explicitly or implicitly adopts in his own EEOC rebuttal submission. All other portions of the City's position statement will be considered only for the limited purpose of establishing West's exhaustion of his EEOC claims. *See Okusami v. Md. Dep't of Health & Mental Hygiene*, No. ELH-18-1701, 2019 WL 1003607, at *10 (D. Md. Feb. 28, 2019) (considering defendant's position statement because it "give[s] rise to a plaintiff's legal right to file a civil suit for employment discrimination and [is] necessarily relied on to satisfy statutory requirements"). The court "will not, and is certainly not required to, accept as true the *defendant's* allegations incidentally attached to the complaint as part of the administrative record." *Vega v. Century Concrete Inc.*, No. 6:21-cv-57, 2022 WL 3006390, at *3

- 17 -

(W.D. Va. July 28, 2022) (declining to consider employer's EEOC position statement attached to plaintiff's complaint). "[D]oing so would turn the motion to dismiss into [a] factual dispute, when the purpose of a motion to dismiss is merely to test the sufficiency of the plaintiff's factual allegations." *Id.* The court will therefore not consider the remaining portions of the City's EEOC position statement for any purpose beyond establishing the exhaustion of West's ADA claims.

### B. Claims Against Individual Defendants

The ADA provides a cause of action only against employers, not supervisors or other employees. *Jones v. Sternheimer*, 387 F. App'x 366, 368 (4th Cir. 2010); *see Baird ex rel. Baird v. Rose*, 192 F.3d 462, 472 (4th Cir. 1999). Because West's sole basis for his claims against the three individual Defendants in this case arises under the ADA, and because the ADA does not provide a cause of action against private individuals, the court dismisses West's action as to Hawkes, Weiss, and Kelly-Bertsche for failure to state a claim upon which relief can be granted.

### C. Claims Against the City of Charlottesville

1. <u>Discrimination</u>

West brings his claims under Title I of the ADA.[3] Title I prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures,

---

[3] West does not specify the ADA title on which his claims are based. Because the Fourth Circuit has held that Title II "unambiguously does not provide a vehicle for public employment discrimination claims," we proceed assuming West has filed under Title I. *Reyazuddin v. Montgomery Cnty., Md.*, 789 F.3d 407, 421 (4th Cir. 2015).

the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

To sufficiently plead a claim for wrongful discharge,[4] a plaintiff must allege that "(1) he was a qualified individual with a disability; (2) he was discharged; (3) he was fulfilling his employer's legitimate expectations at the time of discharge; and (4) the circumstances of his discharge raise a reasonable inference of unlawful discrimination."  *Kelly*, 90 F.4th at 169 (quoting *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012)) (cleaned up).

The parties do not dispute that West has plausibly alleged his epilepsy constitutes a disability protected by the ADA, or that he was a qualified individual.[5]  (*See* Defs.' Br. at 1, 13–17; Defs.' Reply at 6–8.)  And West was undisputedly discharged.  The survival of West's claims beyond the motion-to-dismiss stage thus hinges on whether West has plausibly alleged he was fulfilling the City's legitimate expectations at the time of his discharge and that the circumstances of that discharge raise a reasonable inference of unlawful discrimination.  For the reasons discussed below, the court finds West has not.

---

[4] West appears to claim multiple adverse employment actions for the purposes of his discrimination claim: termination, placement on paid administrative leave, receipt of a written reprimand, and failure to receive training.  However, the court agrees with Defendants that—with the exception of his termination—West forfeited these claims when he failed to address Defendants' arguments against them in his response brief.  *See Caner v. Autry*, 16 F. Supp. 3d 689, 704 (W.D. Va. 2014); (Defs.' Br. in Supp. of Mot. To Dismiss at 14–15 (Dkt. 11) [hereinafter "Defs.' Br."]; Pl.'s Resp. at 20–21; Defs.' Reply at 4–5).  Even if he did not, West fails to plead how the claimed adverse actions (other than termination) negatively affected "the terms, conditions, or benefits of [his] employment."  *See Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997).

[5] West's complaint names anxiety and depression as two additional disabilities.  (Am. Compl. at 4.)  Because West does not allege that these conditions independently rise to the level of a covered disability, the court will consider them sequelae of West's epilepsy and will not conduct a separate analysis of them.

### i. *Legitimate Expectations*

To begin, West has not plausibly alleged that he was fulfilling the City's legitimate expectations of him at the time of discharge. West is correct that he need not allege he "was a perfect or model employee." *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 380 (4th Cir. 2022) (quoting *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019)). But raising a claim of disability discrimination under the ADA does not absolve a plaintiff of the consequences of his inadequate work performance.

West's well-pleaded allegations necessarily defeat any ADA wrongful discharge claim arising from his employment with the City. To begin, West acknowledges that the City's proffered reason for his termination was his poor work performance. (Am. Compl. at 10 ("The reason given to me for the discharge was that I failed to adhere to the requirements in the disciplinary action of March 4, 2022.").) West claims repeatedly that "many of the allegations" in his disciplinary actions "were false," (*id.*), that "multiple points" in his reprimand "were misstated or incorrect," (*id.* at 20, ¶ 37), that disciplinary actions taken against him "were based on false narratives," (Ex. 2 at 15), and that "[m]any of [the City's] reasons listed for termination were admittedly incorrect, or again embellished, or possibly even intentionally created to put him in a bind," (*id.* at 17).

But even taking these allegations—and West's lengthy explanations justifying his conduct—as true under the generous standard of Rule 12(b)(6), the court does not find that West contends *all* of the City's stated reasons for his disciplinary actions and ultimate

termination were false.  West accordingly pleads, and therefore admits, that he—at least in some respects—failed to meet his employer's legitimate expectations.

West nevertheless argues that, even if the City raised real complaints, his performance should be excused because his "peers, supervisors, and [the] IT director himself" committed the same complained-of infractions.  (Am. Compl. at 24, ¶ 10; *see* Ex. 2 at 15–17 ("The infractions were among all of them[.]").)  What West overlooks is that these allegations, taken as true, "might simply reflect that [his co-workers'] job performance too was lacking."  *See King v. Rumsfeld*, 328 F.3d 145, 149 n.3 (4th Cir. 2003).  That is, West's allegations that his co-workers committed similar violations does not go to whether West himself was meeting the City's legitimate expectations of his employment.  West's comparison here to other co-workers' infractions is therefore inapposite.

Nor do West's claims of positive feedback change the court's finding.  West alleges that he received positive feedback from his supervisor Henderson at various points in January and February 2022.  (*See* Am. Compl. at 17–18, ¶¶ 11, 15, 17; Ex 2. at 13, 15–17; Pl.'s Resp. at 5, 10–11.)  This, West argues, supports a finding that he was meeting his employer's legitimate expectations at the time of his termination.  (Pl.'s Resp. at 17 (citing Ex. 2 at 109–10).)  But the "positive feedback" West cites amounts to little more than polite, general office communication and does not amount to the formal indications of good performance other

courts have relied upon in finding sufficient pleadings.[6]  *See, e.g.*, *Corbett v. Richmond Metro. Transp. Auth.*, 203 F. Supp. 3d 699, 706 (E.D. Va. 2016) (considering performance reviews and bonuses); *Fletcher v. Tidewater Builders Ass'n Inc.*, 216 F.R.D. 584, 589 n.7 (E.D. Va. 2003) (finding a recent "superior performance review and raise" sufficient); *EEOC v. Advanced Home Care, Inc.*, 305 F. Supp. 3d 672, 677 (M.D.N.C. 2018) (finding a "satisfactory performance review" sufficient).

Moreover, even were the court to take Henderson's comments in January and February 2022 as ringing endorsements of West's performance, they do not support a finding that at the time of his termination in mid-March, West was still fulfilling his employer's legitimate expectations.  *See Young v. Giant Food Stores, LLC*, 108 F. Supp. 3d 301, 313 (D. Md. 2015) (finding seven years of employment insufficient to plead satisfactory performance because "[i]t remains entirely possible that [the plaintiff] performed well for seven years and then was terminated after her performance began to decline").  West's claim that being left alone to man the Helpdesk the day before his termination proves his satisfactory performance similarly holds no weight: West pleads no facts that support the plausibility of his supervisors leaving him alone because of his superior work performance and not because they were forced to due to staffing shortages.  (*See* Ex. 2 at 14–15, 17.)

---

[6] What West cites as "praise" plainly does not rise to the level of, for example, a performance review.  (*See* Ex. 2 at 109 ("Thanks for holding down the fort"); *id.* ("good job on getting Pather squared away with CommAtty!").)

Because West concedes that the City raised at least some genuine complaints with his work performance, and because West alleges no other facts on which the court could find plausible that he was meeting his employer's legitimate expectations, the court finds West has failed to meet his pleading burden on the count of discrimination against the City.

### ii.  *Reasonable Inference of Unlawful Discrimination*

Even if West had adequately alleged that he was meeting the City's legitimate expectations, which he has not, he nevertheless fails to plead that the circumstances of his discharge raise a reasonable inference of unlawful discrimination.

"To raise a reasonable inference of disability discrimination in a wrongful discharge case, an employee must allege that his disability was a 'but-for' cause of his termination." *Kelly*, 90 F.4th at 169 (citing *Gentry v. E.W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235–36 (4th Cir. 2016)); *see Bing*, 959 F.3d at 618 ("The mere fact that a certain action is potentially consistent with discrimination does not alone support a reasonable inference that the action was motivated by bias."). The Fourth Circuit has acknowledged that it is possible for a plaintiff "to plead [him]self out of court by identifying a legitimate and nondiscriminatory reason for the employer's adverse action." *Barbour*, 105 F.4th at 599. However, "such doomed pleading will happen only if the complaint fails to allege any other facts that support a plausible inference of causation." *Id.* "Indeed, the complaint will not be dismissed unless the employer's explanation 'is so obviously an irrefutably sound and unambiguously nondiscriminatory and non-pretextual explanation that it renders [the plaintiff's] claim of pretext implausible.'" *Id.* (quoting *Woods v. City of Greensboro*, 855 F.3d 639, 649 (4th Cir. 2017)).

- 23 -

West alleges the City offered a non-discriminatory reason for his termination: his poor work performance. (Am. Compl. at 10.) And, as discussed above, he concedes that at least some of the City's proffered reasons for his termination were true. Though "it matters not that some of the [employer's] proffered reasons were grounded in truth" if "other facts indicate that 'the employer was simply looking for a reason to get rid of the employee,'" West fails to allege those other facts. *Barbour*, 105 F.4th at 600 (quoting *Cowgill*, 41 F.4th at 383). At most, West's claim that the City retaliated against him following his request for accommodations "is 'potentially consistent' with disability discrimination." *Kelly*, 90 F.4th at 170 (quoting *Bing*, 959 F.3d at 618). But West "fails to connect the dots." *Id.* West claims the City's proffered reasons were pretextual because (1) the City, through its employee Weiss, acknowledged that at least one of the reasons for the March 4 reprimand was fabricated, and (2) the City failed to reprimand his "peers and co-workers" for many of the same behaviors. (Am. Compl. at 23–24, ¶¶ 8, 11.) But neither of these allegations suggests the City "mistreated him because of his disabilities" rather than his potentially poor work performance. *Kelly*, 90 F.4th at 170.

To the first allegation of Weiss' falsehood, "[t]hat [West] may have been innocent of this offense does not alone give rise to a plausible inference that the stated reason was pretext for unlawful discrimination." *Whorley*, 620 F. Supp. 3d at 439. Instead, West must allege that the City "was motivated by his disability" in offering this false reason for his termination. *See Kelly*, 90 F.4th at 170. Because West offers only conclusory statements as to the City's

motivation, the court cannot infer unlawful discrimination based on West's disability without impermissible speculation.  *See id.* at 170–71 (citing *Bing*, 959 F.3d at 618).

To the second allegation of his co-workers' similar behavior, West fails to allege pretext based on comparators.  When a plaintiff's allegations are based "completely upon a comparison to an employee from a non-protected class," the validity of the plaintiff's claims depends on "whether that comparator is indeed similarly situated."  *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010).  Plaintiffs must therefore plead "that they are similar in all relevant respects to their comparator," *id.*, which might include allegations that the employees "dealt with the same supervisor, were subject to the same standards and engaged in the same conduct."  *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019) (quoting *Haywood*, 387 F. App'x at 359) (cleaned up).

Based on West's allegations, Ringling is the only named employee with the same supervisor and job title.  But though West repeatedly insists Ringling is "similarly situated" to him in all respects, he fails to allege that Ringling was subject to the same standards as him or that Ringling engaged in the same infractions (*i.e.*, closing out substantially fewer Helpdesk questions or tickets and not being able to carry out his duties independently) that the City identified as a main reason justifying West's termination.  Nor does West allege that Ringling was even a member of a non-protected class.  Because West provides no valid comparators, the court finds that West fails to sufficiently allege pretext here.

Additionally, West's complaint lacks any other factual allegations that support an inference that he was terminated because of his disability.  Thus, this court is left to speculate

and "fill in the gaps" regarding the defendant's motive underlying the termination. *Kelly,* 90

F.4th at 169 (quoting *Bing,* 959 F.3d at 618). Because West does not plausibly allege that he

was meeting the City's legitimate expectations of him at the time of his termination, or that

his termination raised a reasonable inference of unlawful discrimination based on his disability,

the court finds that West fails to raise a claim upon which relief can be granted. The court

will therefore dismiss West's ADA claim for disability discrimination against the City.

    2. <u>Retaliation</u>

    At the outset, the court notes that West cannot recover compensatory and punitive

damages for retaliation in violation of the ADA. *See Rhoads v. F.D.I.C.,* 94 F. App'x 187, 188

(4th Cir. 2004) (citing *Kramer v. Banc of America Securities, LLC,* 355 F.3d 961, 963 (7th Cir.

2004)); *Dalton v. Lewis-Gale Med. Ctr., LLC,* No. 7:19-cv-00204, 2019 WL 4394757, at *1–2

(W.D. Va. Sept. 13, 2019) (same). To the extent West seeks those remedies, the court will

dismiss his claims.

    The ADA provides that "[n]o person shall discriminate against any individual because

such individual has opposed any act or practice made unlawful by this chapter or because such

individual made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Activity protected by this

provision notably includes requests to an employer for accommodations for disability. *See*

*Jacobs v. N.C. Admin. Off. of the Cts.,* 780 F.3d 562, 577 (4th Cir. 2015). Employees who engage

in protected activity may not be subject to retaliation through adverse employment actions,

which are those "a reasonable employee" would find "'materially adverse' such that it would

'dissuade a reasonable worker from'" engaging in the protected activity. *Laurent-Workman v. Wormuth*, 54 F.4th 201, 213 (4th Cir. 2022) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). While termination is an obvious example, "[c]ourts within the Fourth Circuit, including this one, have recognized that a written reprimand may constitute an adverse action in the retaliation context." *Gill v. TBG Food Acquisition Corp.*, No. 7:19-cv-00479, 2020 WL 3869569, at *8 (W.D. Va. July 9, 2020) (collecting cases); *see, e.g.*, *Michael v. Va. Commonwealth Univ.*, No. 3:18-cv-125, 2019 WL 128236, at *4 (E.D. Va. Jan. 8, 2019) (finding negative performance review or performance improvement plan can constitute a materially adverse action if the employer later relies upon it to terminate the employee).

To adequately plead an ADA retaliation claim, "the complaint must allege facts supporting a plausible inference that the employer took an adverse employment action against the plaintiff *because of* the plaintiff's protected activity." *Barbour*, 105 F.4th at 590 (cleaned up) (emphasis added). The required element of causation "can be shown in two ways: by 'show[ing] that the adverse act bears sufficient temporal proximity to the protected activity,' or by showing 'the existence of facts that suggest that the adverse action occurred because of the protected activity,' or a combination of the two." *Laurent-Workman*, 54 F.4th at 218–19 (quoting *Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021)); *see Kelly*, 90 F.4th at 170 ("In retaliation cases, temporal proximity suggests a correlation between an employee's protected action and his employer's adverse reaction."). Temporal proximity alone may suffice to establish causation only when the protected activity and adverse action are "very close."

*Laurent-Workman*, 54 F.4th at 219 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)); *see Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 126 (4th Cir. 2021).

West requested a reasonable accommodation under the ADA on February 3, 2024, while working from home at the City's request due to his disability. (Am. Compl. at 9; *id.* at 22, ¶ 2; Ex. 2 at 16.) The next day, the City reprimanded West for his performance while working from home and placed him on administrative leave with pay. (Am. Compl. at 18, ¶¶ 18, 21; Ex. 2 at 54.) Three days after West returned to work in-person—approximately four weeks after his accommodation request—the City issued a written reprimand and placed him on a performance improvement plan. (Am. Compl. at 23, ¶ 8.) Two weeks after doing so—approximately six weeks after West's accommodation request—the City terminated West's employment, citing his failure to comply with the requirements of the written disciplinary action. (*Id.* at 10; *id.* at 24, ¶ 10.)

West adequately pleads that his request for a reasonable accommodation constitutes protected activity under the ADA. He also alleges at least two "materially adverse" actions: his receipt of a written reprimand placing him on a performance improvement plan and his subsequent termination based on failure to comply with that plan.[7] (Am. Compl. at 23–24, ¶¶

---

[7] Though the parties dispute West's alleged adverse employment actions in the context of his discrimination claim, they do not address the adverse actions supporting his retaliation claim in the briefing on this motion. West alleges generally that he was subject to adverse actions including placement on paid administrative leave, failure to receive training, receipt of a written reprimand, and termination. Though the court is not persuaded that temporary paid leave or a single instance of missed training constitutes a materially adverse action in this case, *see Jensen-Graf v. Chesapeake Emps.' Ins. Co.*, 616 F. App'x 596, 598 (4th Cir. 2015), it finds receipt of a written reprimand leading to termination and termination itself to constitute materially adverse actions for the purpose of West's retaliation claim. *See Gill*, 2020 WL 3869569, at *8 (denying motion to dismiss ADA retaliation claim after finding disciplinary notice that "placed [the plaintiff] one step away from termination" sufficiently adverse).

8, 11.)  West suggests that the short period between his protected activity and these adverse actions—four and six weeks, respectively—demonstrates sufficient temporal proximity to raise a plausible allegation of causation.  (Pl.'s Resp. at 22–23.)

Here, the court agrees with West.  Though the Fourth Circuit has suggested that a two-month gap between protected activity and an adverse employment action "is sufficiently long so as to weaken significantly the inference of causation between the two events," *Laurent-Workman*, 54 F.4th at 219 (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)), the period at issue here is notably shorter than that outer boundary.  *See Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179, 192 (4th Cir. 2017) (assuming plaintiff established a *prima facie* case of retaliation when termination occurred "less than six weeks" after protected activity).

Even were the court to find the temporal proximity at issue here unconvincing, under the generous standard of Rule 12(b)(6), it finds any delay should be excused by evidence that the City formally reprimanded West and placed him on a performance improvement plan "at the first opportunity" following his accommodation request and subsequent paid administrative leave.  *See Barbour*, 105 F.4th at 596 (citing *Martin v. Mecklenburg Cnty.*, 151 F. App'x 275, 281 (4th Cir. 2005)) (finding that an adverse action taken at the first opportunity supports causation even where temporal proximity is itself insufficient).  When West received his written reprimand on March 4, he had worked only four days following his accommodation request—one prior to his administrative leave, and three following it.  (Am. Compl. at 22, ¶¶ 2–3, 8; Ex. 2 at 11–12.)  To the extent the four-week gap alleged above is alone insufficient to support causation, it coupled with this four-day period renders plausible that West's

- 29 -

accommodation request was the but-for cause of his termination.  The court therefore finds West has plausibly alleged a causal connection sufficient to support his claim of retaliation. Defendants' motion to dismiss this count is therefore denied as to West's claims for injunctive relief.[8]

3.  Additional Claims

West makes three additional claims: failure to engage in the interactive process, failure to accommodate, and a state-law claim for intentional infliction of emotional distress.  For the following reasons, the court finds each of those claims fails.

First, West raises a claim of failure to engage in the interactive process.  (Am. Compl. at 20–21, ¶ 41; *id.* at 24, ¶ 11; Ex. 2 at 3.)  But "there is no stand-alone claim for failure to engage in the interactive process."  *Hoelzer v. Bd. of Governors of the Univ. of N.C.*, No. 1:20CV1072, 2022 WL 973069, at *8 (M.D.N.C. Mar. 31, 2022); *see Dressel v. Safeway, Inc.*, No. ELH-19-1556, 2020 WL 5880860, at *7 (D. Md. Oct. 2, 2020) ("Although an employer's deficient participation in the statutorily-mandated interactive process may furnish a claim for failure to provide reasonable accommodation, it does not give rise to a separate, independent claim.").  Accordingly, the court may only consider West's failure-to-engage claim as part of his claim that the City failed to provide reasonable accommodation for his disability.

---

[8] The court notes that West requests multiple forms of injunctive relief, including the City receiving training on epilepsy and its effects.  Though the parties have not briefed the issue of standing, the court notes that West's claim survives Defendants' motion to dismiss only as to injunctive relief over which West has standing.

West's claim for failure to accommodate is unsuccessful because his pleadings demonstrate he failed to exhaust this claim before the EEOC. West's EEOC charge does not allege a failure to accommodate. (*See* Am. Compl. at 9–10.) To the contrary, West's charge specifically describes the City approving his requested accommodation for a 9:00 a.m. to 5:00 p.m. work schedule. (*Id.* at 9.) That West was apparently dissatisfied that he was no longer authorized a lunch break with his new schedule does not on its face amount to a claim for failure to provide a reasonable accommodation. (*Id.*); *see also Kelly v. Town of Abingdon*, 437 F. Supp. 3d 517, 527 (W.D. Va. 2020) ("To state a claim for failure to accommodate, a plaintiff must plausibly allege . . . that the employer refused to make [reasonable] accommodations." (internal quotation marks omitted)), *aff'd*, 90 F.4th 158 (4th Cir. 2024). Because West did not effectively raise the claim before the EEOC, the claim is not properly before the court. *See Miles v. Dell, Inc.*, 429 F.3d 480, 491–92 (4th Cir. 2005) (finding plaintiff failed to exhaust administrative remedies for retaliation claim where it was not raised on the face of EEOC charge); *Kerney v. Mountain States Health Alliance*, 894 F. Supp. 2d 776, 780–81 (W.D. Va. 2012) (same).

Nor could West have raised such a claim against the City. West bases his failure-to-accommodate claim on the City's purported failure to engage in the interactive process mandated by the ADA. But West does not raise a plausible claim of failure to engage in the interactive process where he identified and requested a specific accommodation, the City provided that same accommodation, and West does not allege he requested any other form of accommodation which was rejected out of hand by the City. *See Corbett*, 203 F. Supp. 3d at

707 (holding the same). West therefore does not successfully plead a claim of failure to accommodate.

West also raises a claim under Virginia law for intentional infliction of emotional distress. (Pl.'s Resp. at 14–16.) Because West raises this claim in the briefing on the motion to dismiss and not in his complaint, the court finds it is not properly before the court.

## IV.    Conclusion

For the foregoing reasons, the court will grant Defendants' motion to dismiss (Dkt. 11) as to all claims against Hawkes, Weiss, and Kelly-Bertsche. All counts against these individual Defendants will be dismissed with prejudice, as the court concludes that West cannot correct the legal deficiencies in those claims via amendment. The court will also grant Defendants' motion to dismiss claims against the City for disability discrimination and claims against the City seeking compensatory or punitive damages for retaliation. All counts against the City seeking compensatory or punitive damages for retaliation will be dismissed with prejudice, as the court concludes West cannot correct the legal deficiencies in those claims via amendment. All counts against the City for disability discrimination will be dismissed without prejudice with leave to amend. Finally, Defendants' motion to dismiss as to remaining claims against the City for retaliation will be denied.

An appropriate Order shall accompany this Memorandum Opinion.

**ENTERED** this 21st day of January, 2025.

/s/ *Jasmine H. Yoon*

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE